# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

NAJEE SHARIF WILKINS,

      Defendant-Appellant.

UNPUBLISHED
September 19, 2017

No. 332430
Kent Circuit Court
LC No. 15-009355-FC

Before: TALBOT, C.J., and O'CONNELL and CAMERON, JJ.

PER CURIAM.

Defendant, Najee Sharif Wilkins, was convicted by a jury of second-degree murder[1] and perjury during an examination held pursuant to a prosecutor's investigative subpoena.[2] He was sentenced to 45 to 100 years' imprisonment for the second-degree murder conviction and 10 to 40 years' imprisonment for the perjury conviction. Defendant appeals as of right. We affirm.

## I. FACTS AND BACKGROUND

On November 25, 2008, 17-year-old Khiry Walker died from a gunshot wound to the head. The fatal shot was fired from behind, shortly after 7:00 p.m., while Walker was in the Martin Luther King park in Grand Rapids, Michigan. An autopsy was performed the next day and three lead fragments consistent with a .22 caliber bullet were recovered. The park was covered in snow at the time and the police were unable to locate any ballistics evidence during their initial search. However, when the snow melted in February 2009, the police returned and discovered two .22 caliber casings near the location where Walker's body was found.

The investigation was hindered from its early stages owing in large part to a lack of cooperation from witnesses who might have had knowledge concerning Walker's death. From the few people that were willing to speak about the shooting, the police learned that Walker and his friends had been engaged in an ongoing feud with another group of local teenagers. Although the witnesses carefully avoided placing labels on the nature of these groups, the parties

---

[1] MCL 750.317.

[2] MCL 767A.9(1)(b).

stipulated at trial that defendant and Walker were associated with rival street gangs, loosely referred to as "Alto" and "Benjamin" based on the streets where their members lived or spent time. The Benjamin gang included Walker, Domenque Garmon, and Ravonte Chapman. Defendant, Dareyon York, Vondell Davis, Avery Ford, and Billy Wayne Welch were identified as members of Alto. Detective Matthew Kubiak obtained investigative subpoenas for each of the Alto members in 2009 and elicited sworn testimony concerning Walker's death. In pertinent part, defendant testified that he was at York's house on the evening of November 25, 2008, and did not have any information concerning the shooting. Years later, Detective Kubiak received information that ultimately lead the prosecutor to charge Ford, York, Davis, and defendant with perjury in connection with their investigative subpoena testimony. In the wake of the perjury charges, Ford and York recanted their previous testimony and implicated defendant in Walker's murder.

At trial, Walker's family and friends established that he took the bus to Benjamin Street on the night of his death, intending to go to Garmon's house. York testified that he agreed to meet defendant at the bus stop near the southwest corner of the park on the night of the shooting to confront Walker. When Walker disembarked from the bus, he saw defendant, "threw a little punch," and then ran toward the park. According to York, defendant pursued Walker with a .22 caliber Ruger in hand and fired two shots at the ground while yelling for Walker to stop. Walker continued to run and defendant shot in his direction twice more. York did not see Walker fall to the ground, but recalled that defendant got very upset and kept saying, "He fell." Relevant cell phone records introduced at trial were consistent with York's explanation of the events surrounding Walker's death.

Arthur Brown also corroborated much of York's testimony. Brown was driving through the neighborhood at the time of the shooting when he saw two people chasing a young man, heading in the direction of the park pool. He recognized the two pursuers as defendant and York and indicated that they were both armed, though only defendant fired at Walker. Brown also testified about a conversation he had with defendant several weeks later in which defendant said, "[H]e just had a beef with the young man. He did what he had to do." Defendant said that he "laid [Walker] down," which Brown understood to mean that defendant took Walker's life. Several other witnesses described the ongoing feud between the Alto and Benjamin gangs and defendant's possession of a .22 caliber handgun around the time of the shooting. Others reported conversations with defendant in which he tacitly acknowledged his responsibility for Walker's death.

Of particular importance to this appeal, the prosecutor also presented extensive evidence showing that defendant and his brother, Cortez Wilkins, had threatened several witnesses or otherwise interfered with their testimony. For instance, after York was charged with perjury, Cortez visited him in jail at defendant's request and advised him to "stay strong" and "take the Fifth." At trial, York confirmed that Cortez was insinuating he should continue to lie for defendant, as Cortez was aware that York's earlier testimony was untrue. York also recalled that when he talked to defendant about the investigative subpoenas in 2009, defendant said he knew people that could harm York's family. Brown did not detail the threats or intimidation he had experienced, but stated that he had been "harmed" and placed in protective custody in connection with the case. The prosecutor introduced recorded phone calls and jail visits evidencing attempts

to interfere with witness testimony, as well as two letters defendant penned to Cortez, one of which read, in pertinent part:

> What's happening, Big Bro. Well, to start you know that N***a can't make it to no trial. You'll be off parole about time that comes about. But it might not have to go to that extent. A few threats to the family such as Tony, his BM, kids, et cetera. If it was vice versa, I would make it clear that he either switch his story or ain't no limits. Somebody getting touched. Just be extra careful how you do things, and do your dirt all on your lonely. Trust no one. Try to get in touch with my Bro, Antwan on that tip. Shooter for real.
>
> * * *
>
> . . . And you know a couple dollars to some young n****s to spray up a n***a residence can scare a n***a straight. They doing that s**t for free out there. Ask Precious about that 61st District website, and you can get addresses to anyone. Anyways, make sure you stay on point with them Diplomat n****s. Keep them sayin' and keep supporting them. What we about to put in motion gonna be for the lawyers.

Unsurprisingly, several witnesses were extremely hesitant to testify and agreed to do so with reluctance, while Billy Wayne Welch and Rodney Lewis unequivocally refused to testify at all.

## II. EVIDENTIARY ERRORS

We will address the primarily evidentiary errors raised by defendant on appeal first. A trial court's evidentiary rulings are generally reviewed for an abuse of discretion.[3] "An abuse of discretion occurs when the trial court reaches a result that is outside the range of principled outcomes."[4] "When the decision involves a preliminary question of law however, such as whether a rule of evidence precludes admission, we review the question de novo."[5] A preserved, nonconstitutional error is only grounds for reversal if it is more probable than not that the error was outcome determinative.[6]

## A. WITNESS TAMPERING AND INTIMIDATION

For his first claim of error, defendant argues that the trial court erred by admitting evidence of witness tampering and intimidation. MRE 404(b) governs the admissibility of evidence of other crimes, wrongs, or acts and prohibits the use of such evidence to "prove a person's character to show that the person acted in conformity with [his or her] character on a

---

[3] *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011).

[4] *Id*.

[5] *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010).

[6] *People v Gursky*, 486 Mich 596, 619; 786 NW2d 579 (2010).

-3-

particular occasion."[7]  To determine if other-acts evidence is admissible, we apply the three-part test articulated in *People v VanderVliet*.[8]  Under the first prong of the *VanderVliet* test, the evidence must be offered for a proper, nonpropensity purpose.[9]  Evidence that is relevant to a noncharacter purpose should not be excluded merely because it also reflects on the defendant's character.[10]  MRE 404(b)(1) identifies several proper purposes for which other-acts evidence may be offered, none of which are applicable to the evidence of witness tampering or intimidation at issue in this case.  However, the enumerated list is not exhaustive.[11]  In her notice of intent to introduce this evidence, the prosecutor indicated that the evidence would be offered to show defendant's guilty state of mind and to corroborate the truthfulness of witnesses who were reluctant to testify.  These are appropriate, nonpropensity purposes under MRE 404(b) because they do not rest on an impermissible character-to-conduct inference.

The second prong of the *VanderVliet* test incorporates MRE 402's requirement that the evidence be relevant.[12]  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[13]  Defendant contends that evidence of witness tampering or intimidation was irrelevant because it did not have any tendency to show that he killed Walker.  We disagree.  A defendant's effort to influence a witness can be construed as reflecting consciousness of guilt.[14]  Thus, the challenged evidence did have a tendency to make defendant's identity as the shooter more probable than it would have otherwise been.  We also note that defendant's attempts to threaten or intimidate witnesses were relevant to the jury's evaluation of the state's case.  Many witnesses were less than forthcoming at trial and evidence of defendant's direct or indirect threats helped to explain their reluctance to provide detailed testimony.

The final prong set forth in *VanderVliet* incorporates the balancing test of MRE 403,[15] which provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[16]

---

[7] *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000).

[8] *Sabin (After Remand)*, 463 Mich at 55-56, citing *People v VanderVliet*, 444 Mich 52; 508 NW2d 114 (1993), amended by 445 Mich 1205 (1994).

[9] *Sabin (After Remand)*, 463 Mich at 55.

[10] *Mardlin*, 487 Mich at 615.

[11] *Sabin (After Remand)*, 463 Mich at 56.

[12] *Id*. at 55.

[13] MRE 401.

[14] *People v Sholl*, 453 Mich 730, 740; 556 NW2d 851 (1996).

[15] *Sabin (After Remand)*, 463 Mich at 55-56.

[16] MRE 403.

Here, the evidence of witness tampering or intimidation had significant probative value because it demonstrated defendant's consciousness of guilt in a case where the credibility of the only two witnesses with personal knowledge concerning the shooting was called into doubt as a result of the timing and circumstances of their disclosures. York only acknowledged being present at the shooting after he was charged with perjury, and he admitted that he lied to the police throughout their investigation and during his previous sworn testimony. Similarly, Brown did not disclose that he had witnessed the shooting until he was incarcerated for an unrelated matter and hoped to get a deal in exchange for his information. Defense counsel emphasized this point on cross-examination, going into painstaking detail about more than 20 communications Brown had with Detective Kubiak and various prosecutors in which he offered information in exchange for "consideration."

Although this evidence was undoubtedly prejudicial, the risk of *unfair* prejudice did not substantially outweigh the probative value of the evidence. Evidence is unfairly prejudicial if "there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence."[17] Given the other evidence of defendant's guilt, it is unlikely that the jury gave disproportionate weight to defendant's witness tampering and intimidation. The risk of unfair prejudice was also minimalized when the trial court instructed the jury that it could not find defendant guilty of the charged offenses based on evidence concerning other improper acts he may have committed. Accordingly, the trial court did not abuse its discretion by admitting evidence of witness tampering and intimidation.

## B. AD CHRISTIAN'S TESTIMONY

Next, defendant argues that the trial court erred by allowing AD Christian to testify about the neighborhood feud. When asked if he was aware of any problems Walker and his friends were having with other people in the neighborhood, AD reluctantly conceded that he "heard" about a feud. Defendant contends that AD's testimony was not based on first-hand knowledge and should have been stricken as inadmissible hearsay.

The Michigan Rules of Evidence define "hearsay" as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[18] Hearsay is generally inadmissible unless it falls within an exception.[19] Here, it was apparent that AD was hesitant to testify and the balance of his testimony suggested that he may have had more knowledge concerning the feud than he was willing to admit. Though he had previously been friendly with both groups, AD acknowledged that he aligned himself more with Benjamin in the months before the murder, but qualified that he did not consider himself affiliated with *any* gang. AD also explained that he was not getting along with the Alto members due to "[p]ersonal reasons." AD vaguely explained that his knowledge "was based on either what someone told me or if it was based off of what I stated,

---

[17] *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008).

[18] MRE 801(c); *People v Chelmicki*, 305 Mich App 58, 62-63; 850 NW2d 612 (2014).

[19] MRE 802; *Chelmicki*, 305 Mich App at 63.

then -- then it was based on what I seen with my own eyes." Given AD's reluctance to be directly associated with a gang and the ambiguity of his responses, reasonable people might disagree as to whether all or any of AD's testimony constituted hearsay. As such, we do not believe the trial court abused its discretion by overruling defense counsel's objection to AD's testimony because a trial court's decision on a close evidentiary question is not ordinarily an abuse of discretion.[20]

In any event, even if we assumed without deciding that AD lacked personal knowledge concerning the feud, the admission of his testimony was harmless. Other witnesses, including people identified as members of one of the gangs, described a series of altercations that had occurred between Alto and Benjamin beginning in 2006. As such, any error in the admission of AD's testimony confirming the existence of the feud does not justify reversal of defendant's convictions because it is improbable that AD's cumulative testimony affected the outcome of the trial.[21]

## C. RODNEY LEWIS'S PRELIMINARY EXAMINATION TESTIMONY

Next, defendant argues that the trial court erred by admitting Lewis's preliminary examination testimony at trial. Defendant acknowledges that his attorney questioned Lewis at the preliminary examination, but argues that the cross-examination was inadequate because it took place before defense counsel had a substantial portion of the discovery materials. In his Standard 4 brief, defendant also argues that this evidence was inadmissible because Lewis was in the courthouse and available to testify. To the extent that defendant contends that the admission of Lewis's preliminary examination also violated his rights under the Confrontation Clause of the federal constitution, defendant's argument is unpreserved because he did not object to admission of Lewis's previous testimony on constitutional grounds.[22] We review unpreserved issues for plain error affecting substantial rights.[23] "To avoid forfeiture under the plain error rule, a defendant must show actual prejudice," and "reversal is only warranted if the defendant is actually innocent or the error seriously undermined the fairness, integrity, or public reputation of the trial."[24]

MRE 804 provides a number of hearsay exceptions that are only applicable if the declarant is unavailable. For instance, "MRE 804(b)(1) excepts from the rule against hearsay a witness's prior testimony given under oath and subject to cross-examination by the opposing party if . . . the witness is unavailable to testify . . . ."[25] A declarant is considered unavailable if

---

[20] *Sabin (After Remand)*, 463 Mich at 67.

[21] *Gursky*, 486 Mich at 619.

[22] See *Benton*, 294 Mich App at 202 (finding that the failure to object to evidence on Confrontation Clause grounds leaves the issue unpreserved).

[23] *People v Pipes*, 475 Mich 267, 274; 715 NW2d 290 (2006).

[24] *Id*.

[25] *People v Lopez*, 316 Mich App 704, 714; 892 NW2d 493 (2016).

he "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so . . . ."[26]

At the outset of the fifth day of trial, the prosecutor learned that Lewis was no longer willing to participate in the trial. Outside of the jury's presence, the court explained to Lewis that he had been subpoenaed to testify and asked if he was willing to take the stand. Lewis unequivocally refused to be sworn, saying: "No, man, I been gettin' threats that I'm going to be max'd out if I don't testify. I'm straight, man. Nope. I'm to the - - I'm tellin' the prosecutor and the detective, I'm gone, man. I ain't gotta testify. Nope. Straight." Given his adamant refusal, the trial court properly concluded that Lewis was unavailable under MRE 804(a)(2).

Defendant cites this statement as evidence that Lewis was not unavailable because his refusal to testify was prompted by threats from the prosecutor. Although Lewis's statement is admittedly ambiguous, defendant's argument rests on an illogical interpretation. Why would Lewis take the very action, i.e., refusing to testify, that would supposedly result in negative repercussions? Moreover, the record suggests that the threats Lewis referred to were more likely instigated by defendant, rather than the prosecutor. Lewis's recalcitrance arose after the court learned that defendant had been pressuring another witness in the courthouse holding cell during the trial. Additionally, the prosecutor had previously received permission to introduce evidence that defendant fired a gun at Lewis in 2009 after learning that Lewis was cooperating with the police investigation.[27]

Defendant also argues that Lewis's former testimony was inadmissible because defense counsel's cross-examination of Lewis was inadequate owing to the fact that a substantial portion of the discovery materials were not available to defense counsel at the time of the preliminary examination. Former testimony of an unavailable witness is admissible if it was taken at "another hearing" and the party against whom it is offered had an "opportunity and similar motive to develop the testimony."[28] Additionally, the testimony of an unavailable witness who was subject to cross-examination at the time of the former testimony generally comports with the constitutional protection afforded by the Confrontation Clause.[29] It is undisputed that Lewis's prior testimony was taken at "another hearing," and that defense counsel cross-examined Lewis at the time. In reviewing the adequacy of the opposing party's opportunity and motive to develop former testimony, this Court considers:

> (1) whether the party opposing the testimony "had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue"; (2) the nature of the two proceedings-both what is at stake and the applicable burden of proof; and (3) whether the party opposing the

---

[26] *People v Adams*, 233 Mich App 652, 656; 592 NW2d 794 (1999), quoting MRE 804(a)(2).

[27] Evidence of the 2009 shooting was not actually introduced at trial.

[28] *People v Farquharson*, 274 Mich App 268, 272, 275; 731 NW2d 797 (2007).

[29] *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009).

testimony in fact undertook to cross-examine the witness (both the employed and available but forgone opportunities).[30]

Here, Lewis's former testimony was taken at defendant's preliminary examination, the purpose of which was to determine whether there was probable cause to believe that Walker had been murdered and that defendant was the person who killed him.[31] To justify binding defendant over for trial, the prosecutor was only required to present enough evidence concerning each element of the charged offenses to lead "a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of [defendant's] guilt."[32] Thus, the prosecution's burden of proof at the preliminary examination was lower than its burden at trial, where it was obligated to prove every element of the charged offenses beyond a reasonable doubt.[33]

Nonetheless, the focus of the inquiry concerning the adequacy of previous cross-examination is highly fact-sensitive,[34] such that the differing burdens of proof involved in these proceedings are not dispositive. Importantly, defense counsel employed the same strategy at the preliminary examination as he did at trial, i.e., casting doubt on the credibility of the prosecution's witnesses and emphasizing the inconsistencies among their stories.[35] To that end, defense counsel elicited testimony from Lewis admitting that he hoped to "get something" for testifying against defendant. Defense counsel also propounded questions that forced Lewis to reiterate the areas of his testimony that conflicted with other evidence. Defendant's reliance on the mere fact that defense counsel did not have all the discovery materials at the time of the preliminary examination is unpersuasive because the same is true of nearly every criminal prosecution during the early stages of the case, and courts have routinely upheld the admissibility

---

[30] *Farquharson*, 274 Mich App at 278.

[31] See *People v Perkins*, 468 Mich 448, 452; 662 NW2d 727 (2003) ("The purpose of a preliminary examination is to determine whether there is probable cause to believe that a crime was committed and whether there is probable cause to believe that the defendant committed it.").

[32] *Id*. (citation omitted).

[33] *People v Green*, 310 Mich App 249, 255; 871 NW2d 888 (2015).

[34] *Farquharson*, 274 Mich App at 278.

[35] At the preliminary examination, defense counsel argued,

[Y]ou've heard four different stories from four different people, and none of them match. Not even close.

Basically the only thing that the four people have said is that Mr. Wilkins is the one that shot Khiry. Other than that all of the details, everything varies from one to the other, and every one of them was testifying under a promise of leniency for their testimony.

Defense counsel's closing argument at trial reflected the same strategy.

of preliminary examination testimony at subsequent trials.[36]  Although the timing of the preliminary examination could interfere with a defendant's right to cross-examine a witness in some circumstances, defendant's cross-examination of Lewis in this case was adequate. Moreover, for the reasons set forth in Section IV of this opinion, defendant forfeited the protection of the Confrontation Clause as it relates to Lewis by intimidating him into silence.

In any event, defendant cannot demonstrate that Lewis's prior testimony affected his substantial rights or the outcome of the trial.  Defendant contends that if defense counsel had more information at the time of the preliminary examination, he would have questioned Lewis further about his contention that Davis was present at the shooting, as this assertion was contrary to the testimony of the only two eyewitnesses.  However, York and Brown both testified at the preliminary examination *before* Lewis took the stand, and both indicated that defendant and York were the only people to confront Walker before the shooting.  Thus, defense counsel was equipped with the information to pursue this line of inquiry and did, in fact, question Lewis about Davis's purported presence.  Furthermore, defense counsel was still able to present the inconsistencies between Lewis's testimony and other evidence to the jury during closing arguments.

## D.  POLICE AND PROSECUTORIAL VOUCHING

Next, defendant argues that Detective Kubiak and the prosecutor improperly vouched for the credibility of the state's witnesses.  A party challenging the admissibility of evidence must preserve the issue for review by objecting on the same grounds pressed on appeal.[37]  Similarly, "[i]n order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction."[38]  Because defendant did not object to Detective Kubiak's testimony or the alleged instances of prosecutorial vouching, this issue is unpreserved.  As such, we review this issue for plain error affecting substantial rights.[39]

Determinations regarding witness credibility are within the sole province of the jury.[40] Consequently, it is improper for a witness to comment or opine on the truthfulness of another witness.[41]  Defendant contends that Detective Kubiak improperly vouched for Lewis's and Welch's credibility by testifying that neither witness had been charged with perjury.  We

---

[36] See, e.g., *Adams*, 233 Mich App 652 (rejecting challenge to the admissibility of preliminary examination testimony on hearsay and constitutional grounds); *Crawford v Washington*, 541 US 36, 57-58; 124 S Ct 1354; 158 L Ed 2d 177 (2004) (approving of cases in which testimony from preliminary proceedings was admitted at trial).

[37] *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001).

[38] *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).

[39] *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

[40] *People v Musser*, 494 Mich 337, 348-349; 835 NW2d 319 (2013).

[41] *Id*. at 349.

disagree. Detective Kubiak's testimony reported facts, rather than his personal opinion regarding the credibility of the absent witnesses. That neither witness had been charged with perjury only demonstrates that the police did not have a reason to believe they provided false testimony under oath. In other words, the absence of a perjury charge is not the equivalent of confirmation that a witness testified truthfully.

Even if we construed Detective Kubiak's testimony in the manner urged by defendant, there is no reason to believe that it actually prejudiced defendant. Welch did not testify at trial. As such, his credibility was of no importance. Although Lewis's preliminary examination testimony was read to the jury, there was not a significant risk that the jury would give that testimony undue weight. The testimony was extremely brief, consisting of only 12 transcript pages, and the most damaging aspects related to defendant's admission regarding his involvement in Walker's death and defendant's possession of a gun that may have been used in the shooting. But several other witnesses recounted the instances in which defendant discussed Walker's death or recalled seeing defendant with a gun of the same caliber that was used in the shooting. Thus, it is improbable that defendant was unfairly prejudiced by Lewis's cumulative testimony, regardless of whether Detective Kubiak's testimony improperly enhanced Lewis's credibility.

Defendant also contends that the prosecutor vouched for the credibility of her witnesses by repeatedly commenting about witnesses who had been intimidated or refused to testify. According to defendant, these comments effectively implied that the prosecutor had special knowledge that the witnesses who testified were truthful. In reviewing claims of prosecutorial misconduct, this Court must consider the prosecutor's remarks in context, considering the relationship they bear to the evidence and the arguments advanced by the defense.[42] Although the prosecution is not permitted to vouch for the credibility of a witness by implying that it is privy to special information concerning the witness's veracity, the prosecution is free to argue the evidence presented and all reasonable inferences that can be derived from the evidence, including inferences regarding witness credibility.[43]

In her closing arguments, the prosecutor frequently referred to witnesses who had been intimidated or threatened in connection with the investigation or prosecution of the case. However, there was ample evidence of witness tampering presented at trial and the prosecutor fairly made use of that evidence in closing arguments. In fact, having reviewed the prosecutor's closing arguments in context, we consider only one comment noteworthy. The prosecutor reminded the jury that it should treat Lewis's preliminary examination testimony as though it had been presented live at trial because "he was under oath at the time, and was subject to cross-examination, just like he would be here." She then added, "And [Lewis] testified truthfully. Okay?" The prosecutor's failure to tie this assertion to the evidence and related inferences, as she had otherwise done throughout her closing argument, leaves open the possibility that she was improperly vouching for witness credibility. However, this single instance of prosecutorial error

---

[42] *People v Callon*, 256 Mich App 312, 330; 662 NW2d 501 (2003).

[43] *People v Thomas*, 260 Mich App 450, 454-455; 678 NW2d 631 (2004).

-10-

was not so flagrantly prejudicial that it was incapable of being rectified with an appropriate curative instruction. Because the prosecutor's statement went unchallenged and no instruction was requested, this Court will not find error requiring reversal arising from the prosecutor's comment.[44] Furthermore, given the limited value of Lewis's testimony to the state's case, it is improbable that the prosecutor's comment affected the outcome of the proceedings in the manner required to avoid issue forfeiture under the plain error rule.[45]

## III. PROSECUTORIAL MISCONDUCT

Next, defendant raises several claims of prosecutorial misconduct, unrelated to the admission of specific evidence. However, because defendant failed to object to any of the conduct that he now challenges on appeal, this issue is unpreserved.[46] Review of unpreserved claims of error is limited to plain error affecting substantial rights.[47] "To avoid forfeiture under the plain error rule, a defendant must show actual prejudice," and "reversal is only warranted if the defendant is actually innocent or the error seriously undermined the fairness, integrity, or public reputation of the trial."[48]

In his Standard 4 brief, defendant takes issue with three instances of prosecutorial misconduct. First, he argues that the prosecutor deprived him of a fair trial by presenting incredible witnesses who provided completely different stories, as well as false and perjured statements. As defendant notes, it is true that prosecutors are charged with the responsibility of seeking justice, rather than merely obtaining convictions.[49] However, the prosecutor did not shirk this duty in the case at hand. Although several of the state's witnesses had a confirmed history of lying under oath, there is nothing in the record that suggests the prosecutor believed that any of her witnesses would provide false testimony at trial. To the extent that the witnesses' previous, false statements were introduced, they were offered to address the inherent credibility problems connected with inconsistent statements and to allow the witnesses to explain the reasons they had been untruthful in the past. There is nothing improper about presenting evidence relevant to witness veracity and allowing the jury to determine which evidence to credit.

Next, defendant argues that the prosecutor prejudiced him by using the term "murder" throughout the trial, instead of referring only to "the shooting." This argument lacks merit because the evidence supported the conclusion that the shooting was, indeed, a murder. The

---

[44] *Bennett*, 290 Mich App at 476.

[45] *Pipes*, 475 Mich at 274.

[46] *Callon*, 256 Mich App at 329.

[47] *Carines*, 460 Mich at 763-764.

[48] *Pipes*, 475 Mich at 274.

[49] *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007).

prosecution can rely on reasonable inferences arising from the evidence,[50] and is not limited to the "blandest of all possible terms," in presenting the state's case.[51] Here, there was evidence that the gangs with which defendant and Walker were associated were in the midst of an ongoing feud and that defendant shot Walker from behind as Walker attempted to flee from a confrontation instigated by defendant. As such, the prosecutor was free to refer to the shooting as a murder because it was consistent with the evidence and her theory of the case.

Defendant's last allegation of prosecutorial misconduct lacks merit for similar reasons. According to defendant, the prosecutor interjected information that was unsupported by the evidence by saying that defendant "popped the person," even though that statement was not offered by a witness. We disagree. Ford testified that he had a conversation with defendant after the shooting in which defendant boasted about killing Walker. The prosecutor referred to this conversation, asking, "What words was it? That he popped the person? What words did he use about the murder?" Ford then identified the exact, derogatory phrase employed by defendant, which we find unnecessary to repeat here. Viewed in context, it is clear that the prosecutor was attempting to confirm the exact words used by defendant, rather than suggest that defendant said he "popped the person."

## IV. EVIDENCE CONCERNING NONTESTIFYING WITNESSES

Next, defendant raises several issues arising from the manner in which the prosecutor addressed Welch's and Lewis's absence at trial. After it became apparent that Welch refused to testify at trial, the prosecutor asked that the jury be advised of his refusal, as she had referred to his anticipated testimony in her opening statement. Over defense counsel's objection, the court agreed that Detective Kubiak could testify that Welch was subpoenaed but refused to take the stand. When Detective Kubiak testified consistent with this ruling, the prosecutor elicited similar testimony regarding Lewis without objection from defense counsel. Because defense counsel's objection to Detective Kubiak's testimony was based on relevance, rather than the constitutional and evidentiary grounds he now advances on appeal, this issue is unpreserved.[52] As with other unpreserved claims of error, we will review this issue for plain error affecting substantial rights.[53] "To avoid forfeiture under the plain error rule, a defendant must show actual prejudice," and "reversal is only warranted if the defendant is actually innocent or the error seriously undermined the fairness, integrity, or public reputation of the trial."[54]

Unique difficulties arise when a witness asserts the right to remain silent in the presence of the jury in a criminal trial. First, if the substance of the witness's past testimonial statement is still placed before the jury, the defendant's constitutional right of confrontation is implicated

---

[50] *Thomas*, 260 Mich App at 454-455.

[51] *Aldrich*, 246 Mich App at 112 (citation omitted).

[52] See *Benton*, 294 Mich App at 202.

[53] *Carines*, 460 Mich at 763-764.

[54] *Pipes*, 475 Mich at 274.

-12-

because the witness cannot be cross-examined regarding the privileged matters.[55] Second, in some circumstances, the inferences arising from the witness's invocation of a testimonial privilege in the jury's presence can unreasonably infringe upon the defendant's right to a fair trial.[56] Third, evidentiary error results when the prosecution violates its ethical duties by deliberately calling a witness who is intimately connected with the crime, knowing the witness will assert a testimonial privilege.[57]

Here, although Lewis and Welch both refused to testify at trial, their refusals were addressed by the court outside of the jury's presence. Nonetheless, the jury was made aware of this issue when Detective Kubiak testified that both men refused to comply with their subpoenas. While it was not established that either witness had a valid testimonial privilege, defendant may still have been prejudiced by the negative inferences arising from their refusal to testify.[58]

With respect to the constitutional implications under the Confrontation Clause of the Sixth Amendment, defendant argues that his right of confrontation was violated when Detective Kubiak told the jury that Lewis and Welch refused to testify because his explanation was offered as substantive evidence that they had been intimidated. Every criminal defendant has the right to be confronted with the witnesses against him, which "insures that the witness testifies under oath at trial, is available for cross-examination, and allows the jury to observe the demeanor of the witness."[59] However, that right is subject to forfeiture:

> [W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in *Crawford*: that "the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds." . . . That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.[60]

---

[55] *People v Gearns*, 457 Mich 170, 180-182; 577 NW2d 422 (1998), overruled on other grounds by *People v Lukity*, 460 Mich 484; 596 NW2d 607 (1999).

[56] *Gearns*, 457 Mich at 187-188, quoting *Namet v United States*, 373 US 179, 186; 83 S Ct 1151; 10 L Ed 2d 278 (1963).

[57] *Gearns*, 457 Mich at 193-194, 196.

[58] See *id*. at 195.

[59] *People v Yost*, 278 Mich App 341, 370; 749 NW2d 753 (2008), quoting *People v Watson*, 245 Mich App 572, 584; 629 NW2d 411 (2001).

[60] *Davis v Washington*, 547 US 813, 833; 126 S Ct 2266; 165 L Ed 2d 224 (2006) (citation omitted).

Here, although not presented at trial, there was evidence that defendant shot a gun at Lewis in 2009 after learning that Lewis was cooperating with the police investigation. Lewis's fear of testifying was also apparent at the preliminary examination, when he agreed that he was concerned for his safety. Because it appears that Lewis was intimidated into silence, defendant forfeited his right to confront Lewis.

By contrast, it is not apparent from the record why Welch refused to testify. Although his former statement was not technically received in evidence, the substance of his testimony was discussed by the prosecutor in her opening statement:

> Billy Wayne Welch broke down [at the investigative subpoena proceeding]. He cried. This is -- this is a tough kid. He gets up and he cries because -- and then he says, "Najee was my boy. Najee's my boy. I don't want to do this." And then he told us everything. About how the defendant had a .22. About how the defendant talked about it. About how he talked about how he and Dareyon chased him, and then Najee shot him and killed him and left him. Saw him fall.

Other courts have construed similar summaries of a witness's statements to be the "equivalent . . . of testimony" that is not subject to cross-examination, contrary to the requirements of the Confrontation Clause.[61] But the absence of cross-examination only causes constitutional concern when the testimonial equivalent is a crucial link adding critical weight to the case against the defendant.[62] Here, the prosecutor's brief synopsis of Welch's testimony, described days before his refusal to testify was made known to the jury, did not have the critical weight that raises concerns under the Confrontation Clause because the substance of Welch's knowledge was cumulative of the evidence offered by other witnesses.[63]

The second constitutional concern arising from the challenged testimony relates to defendant's due process rights. To the extent that the prosecution makes a "conscious and flagrant attempt to build its case out of inferences arising from the testimony privilege," the prosecutorial misconduct can deny the defendant a fair trial.[64] The focus of this inquiry must be on the effect the alleged prosecutorial misconduct had on the trial, rather than the culpability of the prosecutor's conduct.[65] For example, the Massachusetts Supreme Judicial Court rejected a similar claim of error when "the prosecutor only questioned the witness once, included no 'facts'

---

[61] *Gearns*, 457 Mich at 181-184 (citation omitted).

[62] *Id*. at 181-182.

[63] See *Frazier v Cupp*, 394 US 731; 89 S Ct 1420; 22 L Ed 2d 684 (1969) (finding that the defendant was not denied his confrontation rights when prosecutor summarized witness testimony in opening arguments, did not question the witness further after privilege was asserted on the stand, and the statements were not vitally important to the prosecutor's case).

[64] *Gearns*, 457 Mich at 188, quoting *Namet*, 373 US at 186.

[65] *Gearns*, 457 Mich at 189.

in the form of leading questions, and made no comment about the witness' recalcitrance in his closing argument . . . ."[66] Other states have focused on whether the prosecution "puts questions to the witness, which if not answered, would lead to the inference that the answers, if given, would be unfavorable to the defendant."[67]

Here, defendant argues that the prosecutor deliberately tried to make capital out of Lewis's and Welch's refusals to testify, by arguing that the jury could infer that both witnesses had been intimidated. We disagree. Neither Lewis nor Welch actually appeared before the jury. Thus, the prosecutor could not have continued to ask unanswered questions from which negative inferences could be drawn. Although Lewis's preliminary examination testimony was admitted, the questions put to Lewis at the time were answered, minimizing the possibility that the jury would reach prejudicial inferences from Lewis's silence.

Admittedly, the prosecutor referred to witness tampering several times throughout her closing arguments. But the vast majority of those references were directly tied to evidence properly admitted at trial, rather than inferences derived from witness silence. The few times that the prosecutor relied on *inferences* of intimidation[68] were brief and of little significance when considered in conjunction with the overwhelming amount of direct evidence of intimidation. Thus, there is no reason to believe that the prosecutor's limited references to witness silence during closing arguments deprived defendant of a fair trial.

The last issue arising from Detective Kubiak's testimony regarding Lewis's and Welch's absence is whether the prosecutor violated her ethical duties[69] by calling a codefendant, accomplice, or other witness intimately connected with the crime, *knowing* the witness would assert a testimonial privilege.[70] Unlike the analysis of the related due process issue, the focus of

---

[66] *Id*. at 191, citing *Commonwealth v Kane*, 388 Mass 128, 138; 445 NE2d 598 (1983) (footnote omitted).

[67] *Gearns*, 457 Mich 192, citing *Price v State*, 37 Wis2d 117; 154 NW2d 222 (1967).

[68] The prosecutor only relied on such inferences of intimidation twice in her closing arguments. First, she asked the jury to recall how many inmates refused to take the stand and then remarked that "[f]ear is a huge factor in this case." Later, she summarized Lewis's preliminary examination testimony and suggested that Lewis would not testify at trial because he was fearful of defendant. With respect to the later reference, the inference of intimidation could also be drawn from Lewis's admission at the preliminary examination that he was concerned for his safety.

[69] In *People v Giacalone,* 399 Mich 642, 645; 250 NW2d 492 (1977), the Court cited the American Bar Association standards relating to criminal justice for the notion that "[a] lawyer may not knowingly offer inadmissible evidence or call a witness knowing that he will claim a valid privilege not to testify." Later, in *Gearns*, the Court explained that the validity of the asserted privilege is relevant to the prosecutor's good faith, but is not dispositive of the evidentiary issue. *Gearns*, 457 Mich at 194-196.

[70] *Id*. at 193-196.

this inquiry is on whether the prosecutor acted in good faith.[71]  Here, the prosecutor could not have expected that either witness would testify when she questioned Detective Kubiak about their absence, as both had already confirmed that they would not participate in the trial, regardless of the consequences.  Armed with this knowledge, the prosecutor violated her ethical duty to refrain from placing a witness's refusal to testify before the jury.[72]  Although it was understandable for the prosecutor to be concerned about Lewis's and Welch's absence after she expressly referred to them in her opening statement, the appropriate remedy was to seek a curative instruction.[73]

Nonetheless, because this issue is unpreserved, reversal is only warranted if defendant can demonstrate actual prejudice that resulted in conviction of an innocent defendant or seriously undermines the fairness, integrity, or public reputation of the trial.[74]  For the reasons already explained, defendant has not made the requisite showing here.

## V.  JURY INSTRUCTIONS

Next, defendant argues that the trial court erred by refusing to instruct the jury regarding voluntary manslaughter.  In his Standard 4 brief, defendant also argues that the trial court's instruction regarding the verdict form implied that the jury was required to find defendant guilty of either first-degree or second-degree murder, but could not acquit him of both homicide offenses.  Although defendant preserved the former argument by requesting that a voluntary manslaughter instruction be given, he failed to preserve his second argument by objecting to the court's instruction at trial.[75]

When reviewing a preserved claim of instruction error, "this Court views the instructions as a whole to determine whether the issues to be tried were adequately presented to the jury."[76]  The trial court's decision regarding the applicability of a jury instruction is reviewed for an abuse of discretion, which occurs when the trial court chooses an outcome that "falls outside the range of principled outcomes."[77]  To the extent that this issue is unpreserved, this Court's review is limited to plain error affecting substantial rights.[78]

---

[71] *Id*. at 197-198.

[72] *Id*. at 201.

[73] *Id*. at 195.

[74] *Pipes*, 475 Mich at 274; *Carines*, 460 Mich at 763-764.

[75] *People v Sabin (On Second Remand)*, 242 Mich App 656, 657; 620 NW2d 19 (2000).

[76] *People v Armstrong*, 305 Mich App 230, 239; 851 NW2d 856 (2014).

[77] *Id*.

[78] *People v Jackson (On Reconsideration)*, 313 Mich App 409, 421; 884 NW2d 297 (2015).

"A criminal defendant is entitled to have a properly instructed jury consider the evidence against him."[79]  "Jury instructions must clearly present the case and the applicable law to the jury," including "all elements of the charged offenses and any material issues, defenses, and theories if supported by the evidence."[80]  A defendant charged with murder is entitled to have the jury instructed regarding the lesser included offense of voluntary manslaughter if supported by a rational view of the evidence.[81]  To justify a voluntary manslaughter instruction, there must be evidence that "(1) the defendant killed in the heat of passion; (2) the passion was caused by adequate provocation; and (3) there was no lapse of time during which a reasonable person could have controlled his passions."[82]  The adequacy of provocation is measured under an objective, reasonable-person standard.[83]  Whether provocation is reasonable is typically a question of fact for the jury, but the court may refuse to issue a voluntary manslaughter instruction if, as a matter of law, "no reasonable jury could find that the provocation was adequate."[84]

Defense counsel requested a voluntary manslaughter instruction because York testified that Walker "threw a little punch" at defendant before running from the bus stop.  On appeal, defendant also argues that the instruction was warranted because there was evidence that he was "jumped" by Walker.  We disagree.  According to York, defendant was waiting at the bus stop, armed with a gun, for the express purpose of confronting Walker.  Walker unsuccessfully tried to hit defendant only after seeing him approaching at a fast pace.  Moreover, immediately after this single attempt to strike defendant, Walker tried to run away.  A reasonable person would not be so provoked by an unsuccessful swing that he would be compelled by passion to chase and kill the fleeing "aggressor."  Likewise, the mere fact that Walker may have fought with defendant at some unknown time in the past does not suggest that defendant was acting in the heat of passion when he shot Walker.  Because no reasonable jury could have found that these minor instances of provocation were sufficient to negate the presence of malice, the trial court did not err by rejecting defendant's request for a voluntary manslaughter instruction.

Defendant also takes issue with the trial court's instruction regarding the possible verdicts the jury could return for the murder charge.  In pertinent part, the verdict form read as follows:

We, the jury, in the above-entitled cause, all 12 jurors being in agreement, find upon our oaths that the defendant, NAJEE SHARIF WILKINS, is:

Count 1

☐　　Guilty of First Degree Premeditated Murder

---

[79] *Id*. at 420-421 (citation omitted).

[80] *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005).

[81] *People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003).

[82] *People v Tierney*, 266 Mich App 687, 714; 703 NW2d 204 (2005).

[83] *People v Mitchell*, 301 Mich App 282, 286-287; 835 NW2d 615 (2013).

[84] *Tierney*, 266 Mich App at 715 (citation omitted).

□   Not Guilty.

If you find the defendant not guilty of Count 1 or cannot agree, then you may consider the lesser included offense of Second Degree Murder.

Count 2

□   Guilty of Second Degree Murder

□   Not Guilty.

After identifying the form and the first count, the court explained,

[Y]ou need to follow the instructions underneath that. If you find the defendant not guilty of count one, or you cannot agree on count one, then you must -- you may consider the lesser included offense of second degree. In other words, you need to follow my instructions here. You cannot find the defendant -- you can find him not guilty of both, but you cannot find him guilty of both those. One or the other.

Defendant argues that this instruction was "incredibly confusing" and suggested that the jury was prohibited from acquitting him of both offenses. We see no merit in defendant's view of the above-quoted instruction. The court clearly indicated that the jury was free to "find [defendant] not guilty *of both*" alternative counts.[85] Thus, the trial court did not err with respect to this instruction and defendant is not entitled to relief on that basis.

## VI. SUFFICIENCY OF THE EVIDENCE

Next, defendant challenge the sufficiency of the evidence presented against him. When a defendant challenges the sufficiency of evidence on appeal, the record is reviewed de novo.[86] This Court must "view the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could have concluded that the elements of the offense were proven beyond a reasonable doubt."[87] In doing so, we will not interfere with the factfinder's role of "determining the weight of the evidence or the credibility of witnesses."[88]

Importantly, defendant does not take issue with the prosecutor's proofs relating to any particular element of second-degree murder or perjury. Instead, his challenge to the sufficiency of the evidence is premised on his belief that York, Brown, and Ford were not credible

---

[85] Emphasis added.

[86] *People v Henry (After Remand)*, 305 Mich App 127, 142; 854 NW2d 114 (2014).

[87] *People v Unger*, 278 Mich App 210, 222, 253; 749 NW2d 272 (2008).

[88] *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

witnesses. Thus, his claim of error must fail because this Court will not second-guess the jury's credibility determinations under the guise of reviewing the sufficiency of the evidence.[89]

## VII. SENTENCING

Next, defendant argues that he is entitled to resentencing because the trial court erred in scoring several offense variables and because the upward departure sentence imposed for his second-degree murder conviction was unreasonable.

The trial court's factual findings regarding sentencing variables are reviewed for clear error.[90] Whether the statutory scoring conditions are satisfied by those facts is a question of statutory interpretation, subject to de novo review.[91] This Court reviews departure sentences for an abuse of discretion.[92] The trial court abuses its sentencing discretion by imposing an unreasonable sentence in violation of the principle of proportionality.[93]

As an initial matter, we find it unnecessary to consider the merits of defendant's contentions regarding the scoring of certain offense variables.[94] The trial court unequivocally indicated that it would impose the same sentence, even if the sentencing variables were scored differently. Thus, it is evident that the trial court imposed the instant sentence without relying on a minimum-sentence range derived from improperly scored guidelines. Accordingly, whether defendant is entitled to resentencing depends on whether the departure sentence was reasonable, rather than whether the guidelines were accurately scored.[95]

---

[89] *Id.*

[90] *People v Ambrose*, 317 Mich App 556, 560; 895 NW2d 198 (2016).

[91] *Id.*

[92] *People v Steanhouse*, ___ Mich ___; ___ NW2d ___ (2017) (Docket Nos. 152671, 152849, 152871, 152872, 152873, 152946, 152947, 152948); slip op at 14.

[93] *Id.* at ___; slip op at 4.

[94] Furthermore, we note that defendant's arguments concerning the scoring of his offense variables are largely without merit. With the exception of OV 5 (serious psychological injury to victim's family), MCL 777.35, the trial court did not err in calculating defendant's sentencing guidelines score. This error does not warrant resentencing because defendant would still have been assessed 105 OV points, which is sufficient to place him in the same A-III cell on the sentencing grid. MCL 777.61.

[95] *Ambrose*, 317 Mich App at 565. See also *People v Mutchie*, 468 Mich 50, 52; 658 NW2d 154 (2003), aff'g 251 Mich App 273 (2002) (finding resentencing unnecessary on the basis of scoring error when sentencing court indicated that it would impose the same sentence had the guidelines been scored differently and the appellate court agreed that departure sentence was warranted under then-existing "substantial and compelling reasons" standard).

Although a trial court is no longer constrained by the recommended minimum-sentence range established by the guidelines absent substantial and compelling reasons for departure, the sentence imposed must still be a reasonable one.[96] A sentence is reasonable if it satisfies the principle of proportionality, as articulated in *People v Milbourn*, "which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender."[97] When a defendant's minimum sentence departs from the range recommended by the sentencing guidelines,

> an appellate court's first inquiry should be whether the case involves circumstances that are not adequately embodied within the variables used to score the guidelines. A departure from the recommended range in the absence of factors not adequately reflected in the guidelines should alert the appellate court to the possibility that the trial court has violated the principle of proportionality and thus abused its sentencing discretion. Even where some departure appears to be appropriate, the extent of the departure (rather than the fact of the departure itself) may embody a violation of the principle of proportionality.[98]

Factors that have previously been considered in reviewing the proportionality of a sentence include: "(1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation."[99]

Here, the court determined that the upper level of the recommended minimum-sentence range for defendant's second-degree murder conviction was 37½ years' imprisonment. However, the court concluded that an upward departure was warranted under the circumstances and provided a detailed explanation of its reasoning:

> The evidence was very clear that the jury reached a right verdict in this matter. There is no question that you were the individual, at least in my mind, nor the jurors mind, (sic), that chased this young man, had a .22 caliber pistol, fired several times, and hit him in the back of the head and killed him.
>
> I believe that this was a cold-blooded execution involving two different gangs that were warring at each other.

---

[96] *People v Lockridge*, 498 Mich 358, 391-392; 870 NW2d 502 (2015).

[97] *Steanhouse*, ___ Mich at ___; slip op at 3, quoting *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990).

[98] *Milbourn*, 435 Mich at 659-660.

[99] *People v Steanhouse*, 313 Mich App 1, 46; 880 NW2d 297 (2015), aff'd in part and rev'd in part on other grounds ___ Mich ___ (2017) (citations omitted).

You were convicted under second[-]degree murder which carries a maximum penalty of life or any term of years. You were also convicted of perjury of lying in a prosecutor's investigative subpoena, which also carries a maximum penalty of life or any term of years.

* * *

But the Sentencing Guidelines that have been calculated today, do not take into [account] the crimes that you have committed since this because it is properly calculated at the time that this occurred. . . . In fact, you now have four felonies; nine misdemeanors; a juvenile court record. At this point in your life, you've served seven different jail sentences; three times you've been on probation, and once you've been to prison, and you're only 24 years old.

* * *

And what was most offensive to this Court, was your cold, calculating, obstruction of justice. . . . [T]hings were placed on the record during the course of this trial that you were encouraging witnesses to lie. That you were as -- as bold as to have jail visits which are stated right there that it's being recorded . . . and directing your girlfriend and other people . . . how to tell people not to talk . . . or how to take the Fifth Amendment, not to take deals.

You sent out of the jail, written instructions to have witnesses taken care of so they would not testify. You had your relatives and other gang members you wanted people to shoot at witnesses, or their families, or their homes.

That is absolutely outrageous.

During the course of this trial you -- it came up that you were yelling at people when you were locked up downstairs in this building, threatening them not to testify.

* * *

That significantly affects the ability of this Court to deliver justice and administer fairness. It is outrageous and that type of behavior cannot be tolerated under any circumstances.

* * *

Considering everything, sir, it is the sentence of this Court that you be committed to the Michigan Department of Corrections to serve a minimum of 45 years to a maximum of 100 years.

From this explanation, it is apparent that the trial court considered: (1) factors that are not taken into account by the guidelines, including defendant's age, lack of remorse, and extensive criminal record between the time of the shooting and his conviction in this case; and (2) factors it

-21-

determined were not given adequate weight by the guidelines, namely, defendant's offensive pattern of attempting to obstruct justice by threatening witnesses.[100]  Each of these factors was appropriately considered because they relate to the "seriousness of the circumstances surrounding the offense and the offender."[101]  Based on the record and the court's explanation of its departure sentence, we find defendant's argument regarding the reasonableness of his sentence unpersuasive.

Defendant argues that the court's 45-year minimum sentence is disproportionate when one considers the limitations that would have been imposed upon the court's sentencing discretion had he been convicted of the more serious offense of first-degree murder.  In *Miller v Alabama*, the United States Supreme Court held that sentencing schemes which mandate life sentences, without the possibility of parole, for defendants who were minors at the time of the offense violate the Eighth Amendment prohibition against cruel and unusual punishment.[102]  However, the Supreme Court did not categorically ban life-without-parole sentences for juvenile offenders; *Miller* only requires that a sentencing court "take into account how children are different [from adults], and how those differences counsel against irrevocably sentencing them to a lifetime in prison."[103]  In the wake of *Miller*, Michigan's Legislature enacted MCL 769.25 to codify Miller's individualized sentencing requirement for juvenile defendants convicted of specified offenses, including first-degree murder.[104]  The statute provides that the prosecution may file a motion seeking a life-without-parole sentence, at which point the sentencing court is obligated to hold a hearing to consider the factors identified in *Miller*.[105]  If, after the hearing, "the court decides not to sentence the individual to imprisonment for life without parole eligibility, the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years."[106]

Defendant does not dispute that MCL 769.25 is only applicable to certain, enumerated offenses or that second-degree murder is not among the offenses set forth in the statute.  Instead,

---

[100] We acknowledge that the trial court also assessed 15 points for OV 19, which is appropriately scored when "[t]he offender used force or the threat of force against another person . . . to interfere with, or attempt to interfere with, or that results in the interference with the administration of justice . . . ."  MCL 777.49(b).  However, because points can be assessed under OV 19 for even a single instance of interference with justice, the trial court did not err by concluding that the guidelines did not give adequate weight to defendant's repeated attempts to influence witnesses' testimony, which continued to occur even in the midst of the trial.

[101] *Milbourn*, 435 Mich at 636.

[102] *Miller v Alabama*, 567 US 460, 479; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

[103] *Id*. at 480.

[104] MCL 769.25(2)(b).

[105] *People v Hyatt*, 316 Mich App 368, 384; 891 NW2d 549 (2016).

[106] MCL 769.25(9).

defendant maintains that a 45-year minimum sentence for his second-degree murder conviction cannot satisfy the principle of proportionality when his age would have precluded the court from imposing a minimum sentence in excess of 40 years had he been convicted of the more serious offense of first-degree murder, unless the prosecutor sought a life-without-parole sentence. Although the juxtaposition of defendant's circumstances—having been 17 years old at the time of the homicide, yet unable to qualify for the special treatment outlined in MCL 769.25 because he was found not guilty of the more serious alternative offense—presents an interesting conundrum, we conclude that defendant's 45-year minimum sentence was not disproportionate merely because the sentencing court would have been constrained by MCL 769.25 had the jury found defendant guilty of first-degree murder.

The trial court acknowledged the limitations that MCL 769.25 might have imposed under different circumstances, but correctly observed that second-degree murder does not fall within the ambit of the statutory language. In light of the discussion concerning this issue that took place at sentencing, this Court can infer that the trial court considered the 45-year minimum sentence to be reasonable and proportionate notwithstanding the implications of MCL 769.25. Moreover, the constitutional deficiency that *Miller* sought to remedy was the automatic imposition of the harshest prison sentence without any consideration of the juvenile defendant's diminished culpability, heightened capacity for change, or other factors that distinguish juvenile offenders from their adult counterparts.[107] Here, defendant's sentence was reached by the court after careful consideration of the circumstances surrounding the 2008 murder, as well as defendant's later conduct and criminal history, which the court understandably viewed as alarming. This individualized sentencing procedure was consistent with the spirit of *Miller*.

In a related argument, defendant complains that the trial court erred by considering his age and criminal record as exacerbating factors, rather than considering his long-term prospects for reform. We disagree. Defendant's actions after reaching the age of 18, when courts are no longer required to consider whether he was swayed by the hallmarks of youth, reflect negatively on his long-term prospects for reform. As the court observed, defendant's adult record included four felonies and nine misdemeanors. The number of jail and prison terms defendant completed before this trial suggest that he gained little benefit from past incarceration. Moreover, when sentenced leniently, he often failed to comply with the terms of the intermediate sanctions imposed. By contrast, there was no evidence that defendant had positive reform prospects. In fact, apart from the legal argument concerning MCL 769.25, the most that defense counsel could say on defendant's behalf was: "[H]e was 17 when that happened. We're six years down the road. Lots of things have changed since then." Because the trial court's sentence was the product of individualized sentencing, taking into account the seriousness of the circumstances surrounding the offense and the offender, it was reasonable and consistent with the principle of proportionality.

## VIII.  INEFFECTIVE ASSISTANCE OF COUNSEL

---

[107] *Miller*, 567 US at 479-480.

Lastly, defendant argues that he was denied the effective assistance of counsel when his attorney failed to (1) call Marquis Thomas as a witness at trial; (2) object to the prosecutor's improper remarks; (3) object to the trial court's confusing jury instructions, or (4) object to the errors in the trial court's calculation of defendant's sentencing guidelines.

Ineffective assistance of counsel claims present a mixed question of fact and constitutional law.[108] The lower court's findings of fact are generally reviewed for clear error, while its rulings on questions of constitutional law are reviewed de novo.[109] However, defendant failed to preserve this issue for review by moving for a new trial or *Ginther*[110] hearing in the trial court, and his motion to remand for that purpose was denied by this Court.[111] Accordingly, this Court's review is limited to errors apparent from the record.[112]

To establish a claim of ineffective assistance of counsel, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different."[113] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[114] This Court presumes that defense counsel rendered effective assistance and exercised reasonable professional judgment in all significant decisions.[115] Accordingly, the defendant must "overcome the strong presumption that counsel's performance was born from a sound trial strategy."[116] "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim."[117]

Defendant argues that he was denied the effective assistance of counsel because his trial attorney failed to call Marquis Thomas as a defense witness. According to defendant, Thomas would have testified that David Christian admitted shooting Walker after luring him to the park with the intention of robbing him. However, defendant failed to support this claim of error with evidence contained in the lower court record. Instead, defendant attached a letter written by Thomas before defendant's trial and a later affidavit attesting to the same facts. Pursuant to

---

[108] *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

[109] *Id*.

[110] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[111] *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

[112] *Id*.

[113] *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

[114] *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001), quoting *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

[115] *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012).

[116] *Trakhtenberg*, 493 Mich at 52.

[117] *Carbin*, 463 Mich at 600.

MCR 7.210(A)(1), the record on appeal consists of "the original papers filed in [the lower] court or a certified copy, the transcript of any testimony or other proceedings in the case appealed, and the exhibits introduced." Thus, defendant's reliance on Thomas's letter and affidavit is misplaced, as it constitutes an improper attempt to expand the record on appeal beyond the information presented in the lower court.

Furthermore, even if this Court were to consider Thomas's letter and affidavit, defendant still failed to establish the factual predicate for his claim. Generally, "[d]ecisions regarding whether to call or question witnesses are presumed to be matters of trial strategy."[118] In the absence of a *Ginther* hearing, defense counsel's reasons for declining to call Thomas as a witness are unclear. Nonetheless, we have no difficulty concluding that counsel's decision was objectively reasonable and consistent with sound trial strategy. Thomas's second-hand explanation of David's alleged admission was contradicted by the eyewitness testimony offered by York and Brown. It was also undermined by the numerous witnesses who heard defendant take responsibility for the same shooting. Additionally, because Thomas's only knowledge concerning the incident was based upon his jailhouse conversation with David, it is improbable that the jury would find Thomas's contradictory testimony more credible than the evidence offered by witnesses who had first-hand knowledge concerning the shooting or the ongoing feud leading up to Walker's death.

Defendant also claims that defense counsel was ineffective for failing to object to the prosecutor's improper remarks, the court's confusing jury instructions, or the improper scoring of defendant's sentencing guidelines. These arguments must also fail because the underlying claims of error either lack merit or did not result in prejudice to defendant.

Affirmed.

/s/ Michael J. Talbot
/s/ Peter D. O'Connell
/s/ Thomas C. Cameron

---

[118] *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012).